Anastasia K. Mazzella, California SBN 245201
am@kbklawyers.com; (*admitted to E.D.Wis.*)
Matt Sahak, California SBN 310624
ms@kbklawyers.com; (*admitted to E.D.Wis.*)
**KABATECK LLP**
633 West Fifth Street, Suite 3200
Los Angeles, California 90071
Telephone: (213) 217-5000
Facsimile: (213) 217-5010

Attorneys for Plaintiff Mary Davies

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| MARY DAVIES;<br><br>Plaintiff,<br><br>v.<br><br>PFIZER INC., and PHARMACIA & UPJOHN COMPANY LLC,<br><br>Defendants. | **Case No.:**<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Mary Davies, by and through Plaintiff's counsel, brings this civil action against Defendants for personal injuries and damages suffered by Plaintiff, and alleges upon information and belief as follows:

## JURISDICTION

1. This Court has diversity jurisdiction over this action under 28. U.S.C. § 1332.

2. Venue is proper under 28 U.S.C. § 1391 in that the claim alleged herein arose in Fond du Lac County, Wisconsin, within the Eastern District of Wisconsin.

3. The amount in controversy exceeds $75,000.

## THE PARTIES

4. Plaintiff Mary Davies (hereinafter "Plaintiff") is a citizen of the State of Wisconsin.

5. Defendant Pfizer Inc. (hereinafter "Pfizer") is a for-profit corporation formed in the State of Delaware with its principal office located in the State of New York. All members of Pfizer are citizens of the State of New York. Pfizer is authorized to do and does business throughout the State of Wisconsin.

6. Defendant Pharmacia & Upjohn Company LLC (hereinafter "Upjohn") is a foreign limited liability company formed in the State of Michigan with its principal office located in the State of Michigan. Upjohn is authorized to do and does business throughout the State of Wisconsin.

## FACTUAL ALLEGATIONS

### A. Background of Depo-Provera and its Known Risks.

7. At all relevant times, Pfizer and/or Upjohn held the New Drug Application (NDA) for the drug medroxyprogesterone acetate, which is currently sold under the brand name Depo-Provera

8. Upjohn first developed Depo-Provera in the 1950s.

9. The Food and Drug Administration ("FDA") denied Upjohn's application for Depo-Provera's use as a contraceptive in 1967, 1978, and 1983.

10. The FDA approved Upjohn's application for Depo-Provera's use as a contraception in 1992.

11. Upjohn previously held the NDA for Depo-Provera.

12. Pfizer acquired Upjohn as a wholly owned subsidiary in 2002, thereby acquiring the NDA for Depo-Provera as well as the associated responsibilities and liabilities from the manufacturing, sale, and marketing of Depo-Provera.

13. Pfizer is the current NDA holder for Depo-Provera.

14. Pfizer has officially held the NDA for Depo-Provera since 2020 and, upon information and belief, effectively held the NDA for Depo-Provera since 2002 when it acquired Upjohn.

15. Pfizer's name began to appear on the label for Depo-Provera no later than 2003, alongside that of Upjohn.

16. Pfizer has solely held the NDA for Depo-Provera since 2020.

17. At all relevant times, Defendants engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, labelling, selling, and marketing its products, including the drug medroxyprogesterone acetate, which is sold under the brand name Depo-Provera.

18. Defendants researched, tested, formulated, patented, designed, licensed, labeled, manufactured, marketed, sold, and distributed the drug Depo-Provera and its generic forms to the general public and licensed healthcare providers for human use and consumption.

19. At all relevant times, Defendants authorized and directed and/or participated in the promotion and sale of Depo-Provera when they knew, or, with the exercise of reasonable care, should have known, of the increased risks, hazards, and unreasonable dangerous propensities of Depo-Provera.

20. Depo-Provera is a contraceptive which contains the hormones progestin and/or progesterone.

21. Depo-Provera is administered as an injection every three months to women of childbearing age to suppress ovulation and thicken the cervical mucus.

22. "Depo-Provera" shall hereinafter refer to Depo-Provera and its generic formulations.

23. Defendants authorized and directed the instructions for how consumers, such as Plaintiff, were to receive Depo-Provera.

24. At all relevant times, Depo-Provera was defective, hazardous, unsafe, and dangerous.

25. Specifically, the persistent use of Depo-Provera increased the risk of developing meningioma brain tumors.

26. Meningioma is a tumor that arises in the meninges, which are the membranes that surround the brain and spinal cord.

27. Although usually noncancerous, meningiomas may compress or squeeze the brain, nerves, and vessels, resulting in various symptoms, including, but not limited to, changes in vision, headaches, hearing loss, memory loss, loss of smell, seizures, and weakness.

28. A number of meningiomas may also become metastatic.

29. Treatment of meningiomas typically requires invasive brain surgery, which carries its own risks, including those which may be life-threatening or life-altering.

30. The association between progesterone and meningioma has been known or knowable for decades.

31. Although the FDA approved Depo-Provera for contraception in 1992, numerous studies have been published that have presented findings on the positive correlation between a progesterone and/or progestin medication and the incidence and growth rate of meningioma[1].

32. In 1989, a study found that meningioma cell growth was significantly reduced by exposure to an antiprogesterone agent.[2]

33. In light of these studies, Defendants had a continuing duty to investigate whether Depo-Provera could cause the development of meningiomas.

34. Despite this duty, Defendants failed to conduct any such investigations.

35. In 2023, a studied found "there appears to be a clear progestin meningioma syndrome associated with chronic [Depo-Provera] use."[3] During that study, ten (10) participants were instructed to cease injections of Depo-Provera, five (5) of whom later had "clear evidence of tumor shrinkage."

36. In 2024, a study in the British Medical Journal found that Depo-Provera had an increased risk of intracranial meningioma, second only to cyproterone acetate, which had already been withdrawn from the

---

[1] Grunberg, et al., "Treatment of unresectable meningiomas with the antiprogesterone agent mifepristone," J Neurosurgery, Vol. 74, No. 6, pp. 861-66 (1991); Matsuda, et al., "Antitumor effects of antiprogesterones on human meningioma cells in vitro and in vivo," J Neurosurgery, Vol. 80, N. 3, pp. 527-34 (1994).

[2] Blankenstein, et al., "Effect of steroids and antisteriods on human meningioma cells in primary culture," J Steriod Biochem, Vol. 34, No. 1-6, pp. 419-21 (1989).

[3] Abou-Al-Shaar, et al., "Skull base meningiomas as part of a novel meningioma syndrome associated with chronic depot medroxyprogesterone acetate use," J Neurol Surg Part B Skull Base, Vol. 84:S1-344 (2023).

market due to its association with meningioma.[4]

37. Defendants knew or should have known of the potential risks of Depo-Provera, including the risk of developing meningiomas, but failed to adequately study these risks.

38. Defendants knew or should have known that the discontinuing of Depo-Provera could slow the growth of meningiomas.

39. The label for Depo-Provera has had fourteen (14) iterations, with the most recent being issued in July 2024.

40. None of the labels for Depo-Provera in the United States have contained any warning regarding its risks of causing meningiomas even though such warnings have appeared on labels issued by Pfizer in the European Union.

41. Defendants failed to disclose the known defects of Depo-Provera to Plaintiff, Plaintiff's health care providers, and the general public and, instead, misrepresented that Depo-Provera was safe for intended use.

42. Defendants actively concealed Depo-Provera's known defects and risks of serious harm, including the development of meningiomas.

43. Instead of conducting the reasonable and appropriate testing regarding the risks associated with Depo-Provera, Defendants continued to falsely and misleadingly market the defective Depo-Provera as a safe and effective contraceptive.

44. Despite the medical literature cited above demonstrating the biological plausibility of the association between progesterone and meningioma, evidence of Depo-Provera related cases of meningioma and the evidence of other high dose progesterones causing meningiomas, Defendants have still made no change to the U.S. Depo-Provera label related to intracranial meningioma. Furthermore, Defendants have failed to take any steps to otherwise warn the medical community and Depo-Provera users of these significant health risks, despite changing the label as recently as July 2024 to include warnings about

---

[4] Roland, et al., "Use of progestogens and the risk of intracranial meningioma: national case-control study," British Medical Journal, Vol. 384, published online Mar. 27, 2024 at https://doi.org/10.1136/bmj-2023-078078.

pregnancy-related risks, and despite Defendant Pfizer stating to The Guardian when the BMJ article was released in April 2024: "We are aware of this potential risk associated with long-term use of progestogens and, in collaboration with regulatory agencies, are in the process of updating product labels and patient information leaflets with appropriate wording."[5]

45. Defendant Pfizer has changed the label in the EU and the UK and potentially in other countries. Specifically, Defendants' Depo-Provera label in the EU now contains the following addition under the section titled "Special warnings and precautions for use": "Meningioma: Meningiomas have been reported following long term administration of progestogens, including medroxyprogesterone acetate. Depo-Provera should be discontinued if a meningioma is diagnosed. Caution is advised when recommending Depo-Provera to patients with a history of meningioma."

46. Additionally, Defendants' Package Leaflet in the EU which provides information for the patient states that "before using Depo-Provera[,]... it is important to tell your doctor or healthcare professional if you have, or have ever had in the past ... a meningioma (a usually benign tumor that forms in the layers of tissue that cover your brain and spinal cord)."

47. Nothing was or is stopping Defendants from adding similar language to the label and package insert for Depo-Provera in the United States. Defendants could have at any time made "moderate changes" to the label.

48. Specifically, Defendants could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Depo-Provera's label without any prior FDA approval.

49. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of

[5] "Hormone medication could increase risk of brain tumours, French study finds," The Guardian, published online Mar. 27, 2024 (available at https://www.theguardian.com/society/2024/mar/27/hormone-medication-brain-tumours-risk-progestogens-study) (last accessed January 24, 2025).

studies cited above—are considered a "moderate change." § 340.70(c)(6)(iii).

50. Defendants could have also instructed physicians to consider its own safer alternative design, a lower dose medroxyprogesterone acetate injected subcutaneously instead of the more invasive and painful intramuscular injection method. Studies going back at least ten years have shown that the 150 mg dose of Depo-Provera—when administered subcutaneously, instead of intramuscularly—is absorbed by the body at a similarly slower rate as the lower dose 104 mg Depo-SubQ Provera 104 version.[6] Nevertheless, Defendant never produced a 150 mg subcutaneous version.

51. Knowing that the lower dose 104 mg Depo-SubQ Provera 104 was equally effective and was easier to administer since it involved a smaller needle being injected only below the skin and not all the way into the muscle, Defendants could have educated the gynecology community that it had a safer alternative product to Depo-Provera which was more well known to prescribers and patients.

52. In Europe and other counties outside of the United States, this 104 mg subcutaneous dose has a more accessible trade name, "Sayana Press", unlike the unwieldy proprietary developmental name of "Depo-SubQ Provera 104". Sayana Press sold in Europe may be self-administered by patients, obviating the need for quarterly visits to a medical practitioner.

53. When Depo-SubQ Provera 104, under NDA number 21-583, submitted by Defendant Pharmacia & Upjohn, a subsidiary of Defendant Pfizer, was approved by the FDA on February 17, 2004, more than two decades ago, those Defendants submitted a proposed trade name that the FDA did not approve, so instead, the proprietary name Depo-SubQ Provera 104 was deemed to be the brand name.

54. Defendant Pfizer made a conscious decision to not seek an alternative commercially more accessible brand name, and to not endeavor to more vigorously advocate for the sale of Depo-SubQ Provera 104 to patients seeking contraception, despite knowing it had a lower safer and effective dosage which would mitigate the potential for adverse reactions engendered by a high dose progestin, including the risk of developing or worsening meningioma tumors.

55. The "lowest effective dose" is a well-known concept in the field of pharmaceutics wherein a

[6] See Shelton, et al., "Subcutaneous DPMA: a better low dose approach," Contraception, Vol. 89, pp. 341-43 (2014).

drug-maker should seek to find the lowest possible dose at which the drug of interest is efficacious for the intended use, as any additional dosage on top of that lowest effective dose is inherently superfluous and can increase the risk of unwanted side effects.

56. Either change—adding a warning about the risk of meningioma based on "newly acquired information" or advising physicians to consider a switch to subcutaneous Depo-SubQ Provera 104—either on its own or taken together, would have constituted a "moderate change" or changes justifying a simple CBE supplement that Defendants could have effectuated immediately, and then simply notified the FDA thereafter. Yet, Defendants have failed to do so, and that failure continues to date.

57. Defendants ignored reports from patients and health care providers throughout the United States which indicated that Depo-Provera failed to perform as intended. Defendants also knew or should have known of the effects associated with long term use of Depo-Provera, which led to the severe and debilitating injuries suffered by Plaintiff and numerous other patients. Rather than conducting adequate testing to determine the cause of these injuries for which it had notice or rule out Depo-Provera's design as the cause of the injuries, Defendants continued to falsely and misleadingly market Depo-Provera as a safe and effective prescription drug for contraception and other indications.

58. Defendants' Depo-Provera was at all times utilized and prescribed in a manner foreseeable to Defendants, as Defendants generated the instructions for use for Plaintiff to receive Depo-Provera injections.

59. Plaintiff and Plaintiff's physicians foreseeably used Depo-Provera, and did not misuse or alter Depo-Provera in an unforeseeable manner.

60. Through its affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and her physicians the true and significant risks associated with Depo-Provera use.

61. As a result of Defendants' actions, Plaintiff and her physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendants' conduct.

62. As a direct result of being prescribed and consuming Depo-Provera, Plaintiff has been permanently and severely injured, having suffered serious consequences.

63. As a direct and proximate result of her Depo-Provera use, Plaintiff suffered severe mental

and physical pain and suffering and has sustained permanent injuries and emotional distress, along with economic loss including past and future medical expenses.

64. Despite diligent investigation by Plaintiff into the cause of these injuries, including consultations with medical providers, the nature of Plaintiff's injuries and damages and their relationship to Depo-Provera was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

**B. <u>Plaintiff's History of Taking Depo-Provera and the Damages She Incurred as a Result Thereof.</u>**

65. In 2002, Plaintiff began receiving 150MG injections of Depo-Provera approximately four times a year, every 90 days.

66. Plaintiff regularly received injections four times a year from approximately 2002 to October 10, 2024, the day of her last Depo-Provera injection.

67. Beginning approximately in 2006, Plaintiff developed disturbing symptoms including severe headaches, dizziness, and vertigo. After numerous medical visits and testing procedures, in 2008, Plaintiff was diagnosed with an intracranial meningioma.

68. On September 5, 2008, Plaintiff underwent her first surgery to remove a brain tumor.

69. On January 15, 2016, Plaintiff underwent a craniotomy where surgeons removed three tumors from the left side of her brain and two tumors from the right side of her brain.

70. In February 2016, Plaintiff suffered a brain aneurysm, and had a Pipeline Embolization Device ("PED") implanted behind her left eye.

71. In September 2020, Plaintiff underwent a cortical mastoidectomy with a biopsy of a middle ear mass.

72. Later that same year, in December 2020, Plaintiff underwent surgery to remove a tumor from behind her right ear. Surgeons also removed her right ear canal and ear drum, causing excruciating pain and leaving her deaf in her right ear.

73. On July 23, September 12, and November 22, 2024, Plaintiff underwent three surgeries, to remove tumors and a bone in her skull, and to implant a shunt in her brain. Plaintiff had tumors removed and skull bone removed on right side of her brain due to the tumors growing through her skull bone and putting

pressure on her brain. She had to have a prosthetic bone implanted seven weeks later. After that surgery she had a significant amount of brain fluid swelling her head. She had to have a brain shunt implanted.

74. At no time while Plaintiff was administered Depo-Provera did Defendants inform Plaintiff that she was at risk of developing meningiomas from taking Depo-Provera.

75. At no time during the above events did Plaintiff have any knowledge that her injuries and other damages had any relation with Depo-Provera.

76. Defendants willfully, wantonly, and intentionally withheld information from Plaintiff, Plaintiff ‘s physicians, and the general public regarding the known risks associated with Depo-Provera, including the development of meningiomas, and how such risks can be mitigated.

77. Due to Defendants' concealment of the risks of developing meningiomas though the use of Depo-Provera, neither Plaintiff nor her physicians were aware, nor could that have reasonably known through reasonable diligence, of these risks.

78. As a direct and proximate result of Defendants' negligence and the defectiveness of Depo-Provera, Plaintiffs suffered economic and non-economic damages.

79. In January 2025, Plaintiff was terminated from her employment and placed on long-term disability. Plaintiff had been employed as Environmental Health and Safety and Security Manager for Alliance Laundry Systems in Ripon, Wisconsin. She planned on retiring at age 70.

80. Plaintiff was unaware of the link between Depo-Provera and meningioma tumors until October 2024, when she saw a commercial on television, following publicity associated with a large case control study in France published in March 2024. She saw the commercial the day after she received her last Depo-Provera shot. It was a commercial on TV.

81. Due to Defendants' acts and omissions described herein, Plaintiff suffered damages including, but not limited to:

a. Meningiomas.

b. Lost earnings and reduced earning capacity.

c. Medical expenses.

d. Excruciating physical pain, loss of hearing in right ear, loss of vision, headaches, dizziness.

e. Loss of sleep, loss of balance, lack of energy, depression.

f. Emotional distress and anguish.

**COUNT I**

**PRODUCTS LIABILITY– STRICT LIABILITY (MANUFACTURING DEFECT)**

**(Wis. Stat. § 895.047(1)) (Against all Defendants)**

82. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

83. Defendants are sellers of Depo-Provera.

84. Defendants had a duty to exercise reasonable care in the design, testing, research, manufacture, marketing, distribution, and sale of Depo-Provera.

85. At all relevant times herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Depo-Provera, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants..

86. Defendants knew, or should have known, from the time of its manufacture, distribution, and sale of Depo-Provera and prior to the incidents underlying this Complaint, that Depo-Provera was unreasonably dangerous and would subject users and consumers, such as Plaintiff, to unreasonable risk of serious bodily injury.

87. Plaintiff was a consumer of Depo-Provera because she was in a class of persons that Defendants should have reasonably foreseen as being subject to harm at the time its products were used by Plaintiff.

88. Plaintiff used Depo-Provera in a manner for which it was intended and in a reasonable manner as anticipated.

89. The Depo-Provera that Plaintiff used was in a defective condition and unreasonably dangerous when used in reasonably expectable ways of handling or consumption.

90. The defects to Depo-Provera were foreseeable and Plaintiff's injuries and damages would not have occurred but for the use of the product.

91. Plaintiff was not aware of the defective condition of the Depo-Provera nor could she have reasonably discovered its defectiveness.

92. As a direct result of Defendants' actions and omissions, Plaintiff suffered economic and non-economic damages, including physical pain and suffering, lost wages, disability, medical expenses, and emotional distress.

**COUNT II**

**PRODUCTS LIABILITY– STRICT LIABILITY (DESIGN DEFECT)**

**(Wis. Stat. § 895.047(1)) (Against all Defendants)**

93. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

94. At all times material herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Depo-Provera and placed Depo-Provera into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

95. Defendants, as manufacturers, designers, distributers, and marketers of pharmaceutical drugs, had a duty to design a product free from a defective condition that was unreasonably dangerous to Plaintiff.

96. Depo-Provera was designed in such a way, using such a high dose of progesterone not necessary for effective contraception, that it posed an unreasonable risk of intracranial meningioma and by placing and keeping Depo-Provera on the market despite Depo-Provera being in a defective condition.

97. Depo-SubQ Provera 104 is a lower dosage version of Depo-Provera that contains 104 mg / 0.65mL and is injected subcutaneously every three (3) months. According to the label, Depo-SubQ Provera 104 can be used for both contraception and treatment of endometriosis.

98. Depo-SubQ Provera 104 never attained meaningful market share, and Defendant failed to promote the product to the medical community as a safer and equally effective method of contraception for women choosing to receive quarterly injections.

99. Defendant failed to promote and encourage conversion of the prescribing gynecological community to Depo-SubQ Provera 104, fearing that doing so could instill a concern of safety as to the risks of its high dose progesterone long standing product, Depo-Provera.

100. Defendants had a viable safer and lower dose alternative in Depo-SubQ Provera 104 but failed to warn the medical community prescribing and administering Depo-Provera that Depo-SubQ Provera 104 was a safer alternative.

101. Moreover, the 150 mg Depo-Provera itself could have been a viable lower effective dose if it had simply been designed, approved, and sold to be administered subcutaneously, like Depo-SubQ Provera 104 is administered, instead of intramuscularly.

102. Injections given intramuscularly are well-known to be absorbed by the body and taken up in the blood serum at much faster rates than injections given subcutaneously because of the much higher vascularization of deep muscle tissue compared to the dermis.

103. Studies have shown that 150 mg Depo-Provera administered intramuscularly causes a spike in blood serum levels of DMPA that is more than four (4) times higher than the peak blood serum concentration of DMPA when that same 150 mg Depo-Provera shot is given subcutaneously, and that very high intramuscular peak concentration persists for several days.[7] In fact, 150 mg Depo-Provera administered subcutaneously has a remarkably similar pharmacokinetic profile to Depo-SubQ Provera 104.[8]

104. Thus, there are two lower effective doses of Depo-Provera—both Depo-SubQ Provera 104, and the very same 150 mg Depo-Provera simply given subcutaneously instead of intramuscularly.

105. Defendants wantonly and willfully failed to apprise the public, including the FDA, the medical community, Plaintiff, Planned Parenthood, and Plaintiff's physicians, of the greatly reduced risk of meningioma when injecting 150 mg Depo-Provera subcutaneously compared to the indicated method of intramuscular injection because Defendants did not want to raise any alarms with respect to

---

[7] *See* Shelton, et al., "Subcutaneous DPMA: a better low dose approach," *Contraception*, Vol. 89, pp. 341-43 (2014).

[8] *See id.* at 342.

the safety profile of Depo-Provera and did not want to lose any of its lucrative market share held in part through its contracts with "authorized generic" partners and subsidiaries.

106. Defendants knew or should have known that the Depo-Provera they developed, manufactured, labeled, marketed, sold, and/or promoted was defectively designed in that it posed a serious risk of severe and permanent intracranial-meningioma-related injuries when injected intramuscularly.

107. Defendants have a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor their product.

108. Defendants sold, marketed and distributed a product that is unreasonably dangerous for its normal, intended, and foreseeable use.

109. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Depo-Provera, a defective product which created an unreasonable risk to the health of consumers, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

110. The Depo-Provera supplied to Plaintiff by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it was in an unreasonably dangerous and a defective condition because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable to Defendants, posing a risk of serious and potentially debilitating intracranial meningioma to Plaintiff and other consumers.

111. The Depo-Provera ingested by Plaintiff was expected to, and did, reach Plaintiff without substantial change in the condition in which it is sold.

112. The Depo-Provera ingested by Plaintiff was in a condition not contemplated by the Plaintiff in that it was unreasonably dangerous, posing a serious risk of permanent vision and retinal injuries.

113. Depo-Provera is a medication prescribed for contraception and treatment of endometriosis, among other uses. Depo-Provera in fact causes serious and potentially debilitating intracranial meningioma, a brain tumor that can cause severe damage and require invasive surgical removal, harming Plaintiff and other consumers.

114. Plaintiff, ordinary consumers, and prescribers would not expect a contraceptive drug designed, marketed, and labeled for contraception to cause intracranial meningioma.

115. The Depo-Provera supplied to Plaintiff by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it had not been adequately tested, was in an unreasonably dangerous and defective condition, provided an excessive dose of progestin for its purpose and posed a risk of serious and potentially debilitating intracranial meningioma to Plaintiff and other consumers.

116. The Depo-Provera supplied to Plaintiff by Defendants was defective in design or formulation in that its effectiveness as a contraceptive did not outweigh the risks of serious and potentially debilitating intracranial meningioma posed by the drug. In light of the utility of the drug and the risk involved in its use, the design of the Depo-Provera drug makes the product unreasonably dangerous.

117. Depo-Provera's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiff expected.

118. The intended or actual utility of Depo-Provera is not of such benefits to justify the risk of intracranial meningioma which may cause severe and permanent injuries, thereby rendering the product unreasonably dangerous.

119. The design defects render Depo-Provera more dangerous than other drugs and therapies designed for contraception and causes an unreasonable increased risk of injury, including, but not limited, to potentially debilitating intracranial meningioma and sequelae related thereto.

120. Defendants knew or should have known through testing, generally accepted scientific knowledge, advances in the field, published research in major peer-reviewed journals, or other means, that Depo-Provera created a risk of serious and potentially debilitating intracranial meningioma and sequelae related thereto.

121. Depo-Provera is defective and unreasonably dangerous to Plaintiff and other consumers in that, despite early indications and concerns that Depo-Provera use could result in vision issues, Defendants failed to adequately test or study the drug, including but not limited to: pharmacokinetics

and pharmacodynamics of the drug, its effects on the development of brain tumors like intracranial meningioma, the potential effects and risks of long-term use, the potential for inter-patient variability, and/or the potential for a safer effective dosing regimen.

122. Defendants knew or should have known that consumers, Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Depo-Provera's defective design.

123. Depo-Provera is defective and unreasonably dangerous to Plaintiff and other consumers even if Defendants had exercised all possible care in the preparation and sale of Depo-Provera.

124. As a direct and proximate result of Defendants' conduct and defective design, including inadequate testing and research, and the defective and dangerous nature of Depo-Provera, Plaintiff suffered bodily injuries that resulted in pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer losses in the future.

## COUNT III

## PRODUCTS LIABILITY– STRICT LIABILITY (INADEQUATE WARNING) (Wis. Stat. § 895.047(1)) (Against all Defendants)

125. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

126. At all times material herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Depo-Provera and placed Depo-Provera into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

127. Defendants, as manufacturers, distributers, and marketers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known based on information that was available and generally accepted in the scientific community that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Depo-Provera were inadequate.

128. Plaintiff and Plaintiff’s treating physicians did not have the same knowledge as Defendants and no adequate warning or other clinically relevant information or data was communicated to Plaintiff or to Plaintiff's treating physicians.

129. Defendants had and continue to have a duty to provide adequate warnings and instructions for Depo-Provera, to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their product.

130. Defendants had and continue to have a duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data generally accepted within the scientific community regarding the risks and dangers associated with Depo-Provera, as it became or could have become available to Defendants.

131. Defendants marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug, Depo-Provera, to health care providers empowered to prescribe and dispense Depo-Provera, to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data regarding the risk of meningioma and the risks of unnecessarily excessive progestin exposure which was available and generally accepted within the scientific community. Through both omission and affirmative misstatements, Defendants misled the medical community about the risk and benefit balance of Depo-Provera, which resulted in injury to Plaintiff.

132. Defendants knew or should have known through testing, scientific knowledge, advances in the field, published research in major peer-reviewed journals, or otherwise, that Depo-Provera created a risk of developing serious and debilitating intracranial meningioma. At all relevant times this information was readily available and generally accepted within the scientific community.

133. Despite the fact that Defendants knew or should have known based on information generally accepted within the scientific community that Depo-Provera with its higher than needed progestin dosage caused unreasonable and dangerous side effects, they continue to promote and market Depo-Provera without providing adequate clinically relevant information and data or recommending patients be monitored.

134. Defendants knew that a safer alternative design and product existed, including its own Depo-SubQ Provera 104 which contained substantially less progestin but was equally effective in preventing pregnancy, but failed to warn the medical community and the patients about the risks of the high dose which could be mitigated by using the lower dose formulation, Depo-SubQ Provera 104.

135. Defendants knew or should have known that consumers, and Plaintiff, specifically, would foreseeably and needlessly suffer injury as a result of Defendants' failures.

136. The Depo-Provera supplied to Plaintiff by Defendants was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold, and Defendants also acquired additional knowledge and information confirming the defective and unreasonably dangerous nature of Depo-Provera. Despite this knowledge and information, Defendants failed and neglected to issue adequate warnings that Depo-Provera causes serious and potentially debilitating intracranial meningioma and/or instructions concerning the need for monitoring and potential discontinuation of use of Depo-Provera.

137. Defendants' failure to provide adequate warnings or instructions rendered Depo-Provera unreasonably dangerous in that it failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendants, and in that the risk of danger outweighs the benefits.

138. Defendants failed to provide timely and adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and Plaintiff's intermediary physicians.

139. Plaintiff's various prescribing physicians, nurse practitioners, physician assistants, and nurses (hereinafter collectively referred to as "Plaintiff's Prescribing and Administering Health Care Providers") would not have prescribed and administered Depo-Provera to Plaintiff had they been apprised by Defendants of the unreasonably high risk of meningioma associated with usage of Depo-Provera.

140. Alternatively, even if Defendants had apprised Plaintiff's Prescribing and Administering Health Care Providers of the unreasonably high risk of meningioma associated with usage of Depo-Provera and these Prescribing and Administering Health Care Providers had still recommended usage of Depo-Provera to Plaintiff, the Prescribing and Administering Health Care

Providers would have relayed the information concerning the risk of meningioma to Plaintiff, and the alternative treatment of the lower dose subcutaneous Depo-SubQ Provera 104, and Plaintiff as an objectively prudent person would not have chosen to take Depo-Provera, and/or would have opted to take safer and lower dose Depo-SubQ Provera 104, notwithstanding Plaintiff's Prescribing Physician and Administering Health Care Providers' continued recommendation.

141. Similarly, if Defendants had warned of the unreasonably high risk of meningioma associated with the usage of Depo-Provera, and the availability of the safer and equally effective lower dose Depo-SubQ Provera 104 in the Patient Information handout, Plaintiff as an objectively prudent person would not have chosen to take Depo-Provera, and/or would have opted to take the safer, lower, and equally effective dose of Depo-SubQ Provera 104, notwithstanding Plaintiff's Prescribing and Administering Health Care Providers' recommendation.

142. Defendants failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's Prescribing and Administering Health Care Providers of the dangerous risks of Depo-Provera including, among other things, the development of intracranial meningioma.

143. Defendants failed to provide adequate post-marketing warnings and instructions after Defendants knew or should have known of the significant risks of, among other things, intracranial meningioma.

144. Defendants continued to aggressively promote and sell Depo-Provera, even after they knew or should have known of the unreasonable risks of intracranial meningioma caused by the drug.

145. Defendants had an obligation to provide Plaintiff and Plaintiff's Prescribing and Administering Health Care Providers with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Depo-Provera, and/or that there existed safer and more or equally effective alternative drug products.

146. By failing to adequately test and research harms associated with Depo-Provera, and by failing to provide appropriate warnings and instructions about Depo-Provera use, patients and the medical community, including prescribing doctors, were inadequately informed about the true risk-benefit profile of Depo-Provera and were not sufficiently aware that serious and potentially

debilitating intracranial meningioma might be associated with use of Depo-Provera. Nor were the medical community, patients, patients' families, or regulators appropriately informed that serious and potentially debilitating intracranial meningioma might be a side effect of Depo-Provera and should or could be reported as an adverse event.

147. The Depo-Provera products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective due to inadequate post-marketing surveillance and/or warnings because, even after Defendants knew or should have known of the risks of severe and permanent intracranial meningioma-related injuries from ingesting Depo-Provera, Defendants failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market and/or promote Depo-Provera.

148. Depo-Provera is defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendants had exercised all possible care in its preparation and sale.

149. The foreseeable risk of serious and potentially debilitating intracranial meningioma caused by Depo-Provera could have been reduced or avoided by Plaintiff, prescribers, and/or other consumers had Defendants provided reasonable instructions or warnings of these foreseeable risks of harm.

150. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, dilution or lack of information, lack of adequate testing and research, and the defective and dangerous nature of Depo-Provera, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

**COUNT VI**

**PRODUCTS LIABILITY– NEGLIGENT MANUFACTURING**

**(Against all Defendants)**

151. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

152. Defendants had a duty to manufacture Depo-Provera consistent with the specifications, requirements, regulations, and conditions of approval.

153. At all relevant times herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Depo-Provera, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

154. At the time that the Depo-Provera left the control of Defendants and was administered to Plaintiff, it was unreasonably dangerous.

155. Defendants breached their duty of due care by failing to exercise the degree of reasonable care that was expected of a reasonably prudent manufacturer of medical products, such as Depo-Provera, under similar circumstances.

156. Defendants' breach of reasonable care includes, but it no limited to, its failure to employ good manufacturing practices consistent with the standards in the industry for manufacturing, monitoring, testing, and distributing Depo-Provera.

157. The Depo-Provera administered to Plaintiff was unreasonably defective as a result of Defendants' failure to use reasonable care.

158. Since Defendants failed to meet its duty of reasonable case, Plaintiff, and her treating physicians, did not know, and had no reason to know, that Depo-Provera was causing Plaintiff's injuries.

159. As a direct result of Defendants' actions and omissions, Plaintiff suffered economic and non-economic damages, including physical pain and suffering, lost wages, disability, medical expenses, and emotional distress.

## **<u>COUNT V</u>**

## **PRODUCTS LIABILITY– NEGLIGENT DESIGN**

**(Against all Defendants)**

160. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

161. At all times material herein, Defendants had a duty to exercise reasonable care and had the duty of an expert in all aspects of the design, formulation, manufacture, compounding, testing, inspection, packaging, labeling, distribution, marketing, promotion, advertising, sale, testing, and research to assure the safety of Depo-Provera when used as intended or in a way that Defendants could reasonably have anticipated, and to assure that the consuming public, including Plaintiff and Plaintiff's physicians, obtained accurate information and adequate instructions for the safe use or non-use of Depo-Provera.

162. At all times material herein, Defendants failed to exercise reasonable care and the duty of an expert and knew, or in the exercise of reasonable care should have known, that Depo-Provera was not properly manufactured, designed, compounded, tested, inspected, packaged, distributed, marketed, advertised, formulated, promoted, examined, maintained, sold, prepared, or a combination of these acts.

163. Each of the following acts and omissions herein alleged was negligently and carelessly performed by Defendants, resulting in a breach of the duties set forth above. These acts and omissions include, but are not restricted to negligently and carelessly:

a. Failing to use due care in developing, testing, designing, and manufacturing Depo-Provera so as to avoid the aforementioned risks to individuals when Depo-Provera was being used for contraception and other indications;

b. Failing to conduct adequate pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Depo-Provera; and

c. Designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable use, which Defendants knew or should have known could cause injury to Plaintiff.

d. Failing to use due care in developing, testing, designing, and manufacturing Depo-Provera with the lowest effective dose as a safer alternative which clearly existed at all relevant times so as to avoid the aforementioned risks to individuals when high dose progestin Depo-Provera was being used for contraception.

164. Defendants' negligence and Depo-Provera's failures arise under circumstances precluding any other reasonable inference other than a defect in Depo-Provera.

165. Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Depo-Provera was a proximate cause of Plaintiff's injuries and damages.

166. As a direct and proximate result of Defendants' negligence, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

## COUNT VI

## BREACH OF EXPRESS WARRANTY

## (Wis. Stat. § 402.313) (Against all Defendants)

167. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

168. Defendants expressly warranted to Plaintiff and the general public that Depo-Provera was safe, non-defective, and fit and proper for its intended use as a contraceptive, through Pfizer and/or its authorized agents, in publications, labeling, the internet, and other communications.

169. Plaintiff reasonably relied on the skill and judgment of Defendants and upon said express warranty, in using Depo-Provera.

170. Plaintiff and her physicians reasonably relied upon Defendants' representations that Depo-Provera was safe in their decision to prescribe, purchase, and/or use the drug.

171. Defendants did not have adequate proof that Depo-Provera was safe and effective.

172. Depo-Provera did not conform with the representations made by Defendants.

173. Instead of being safe and effective, as represented by Defendants, Depo-Provera was defective and caused severe side effects.

174. Defendants' warranty and representations were untrue in that Depo-Provera was unsafe, hazardous, and unsuited for the use for which it was intended and marketed.

175. Plaintiff used Depo-Provera for the purpose and in the manner intended by Defendants.\

176. Plaintiff and her physicians could not have discovered through the use of reasonable care Defendants' breach of warranty and Depo-Provera's hidden risks and unreasonable dangers.

177. The breach of warranty was a substantial factor in bringing about Plaintiff's injuries.

178. As a direct and proximate result of reliance upon Defendants' breaches of warranty, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, past and future medical care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and other damages. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

**COUNT VII**

**BREACH OF IMPLIED WARRANTY**

**(Wis. Stat. § 402.314) (Against all Defendants)**

179. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

180. At all relevant times herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Depo-Provera, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

181. Defendants were the sellers of the Depo-Provera and sold Depo-Provera to be taken for contraception or to treat endometriosis, among other indications. Plaintiff was prescribed and purchased Depo-Provera for these intended purposes.

182. When the Depo-Provera was prescribed by Plaintiff's physicians and taken by Plaintiff, the product was being prescribed and used for the ordinary purpose for which it was intended.

183. Defendants impliedly warranted their Depo-Provera product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and ingested, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

184. Defendants breached their implied warranties of the Depo-Provera product because the Depo-Provera sold to Plaintiff was not fit for its ordinary purpose as a contraceptive or to treat endometriosis safely and effectively, among other uses.

185. The Depo-Provera would not pass without objection in the trade; is not of fair average quality; is not fit for its ordinary purposes for which the product is used; was not adequately contained, packaged and labeled; and fails to conform to the promises or affirmations of fact made on the container or label.

186. Defendants' breach of their implied warranties resulted in the intramuscular administration of the unreasonably dangerous and defective product into Plaintiff, which placed Plaintiff's health and safety at risk and resulted in the damages alleged herein.

187. As a direct and proximate result of reliance upon Defendants' breaches of warranty, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, past and future medical care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and other damages. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

## COUNT VIII

## NEGLIGENT MISREPRESENTATION

**(Against all Defendants)**

188. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

189. At all relevant times, Defendants negligently provided Plaintiff, her healthcare providers, and the general medical community with false or incorrect information or omitted or failed to disclose material information concerning Depo-Provera, including, but not limited to, misrepresentations regarding the safety and known risks of Depo-Provera.

190. The information distributed by the Defendants to the public, the medical community, Plaintiff, and her Prescribing and Administering Health Care Providers, including advertising campaigns, labeling materials, print advertisements, commercial media, was false and misleading and contained omissions and concealment of truth about the dangers of Depo-Provera.

191. Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's Prescribing and Administering Health Care Providers; to falsely assure them of the quality of Depo-Provera and induce the public and medical community, including Plaintiff and her Prescribing and Administering Health Care Providers to request, recommend, purchase, and prescribe Depo-Provera.

192. The Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, medical device manufacturers, Plaintiff, her Prescribing and Administering Health Care Providers and the public, the known risks of Depo-Provera, including its propensity to cause intracranial meningioma and sequelae related thereto.

193. Defendants made continued omissions in the Depo-Provera labeling, including promoting it as safe and effective while failing to warn of its propensity to cause intracranial meningioma and sequelae related thereto.

194. Defendants made additional misrepresentations beyond the product labeling by representing Depo-Provera as safe and effective for contraception and other indications with only minimal risks.

195. Defendants misrepresented and overstated the benefits of Depo-Provera to Plaintiff, Plaintiff's Prescribing and Administering Health Care Providers, and the medical community without properly advising of the known risks associated with intracranial meningioma and sequelae related thereto.

196. Defendants misrepresented and overstated that the Depo-Provera dosage was needed to protect against pregnancy when Defendants knew that a safer alternative existed with forty-six (46) fewer mg per dose of the powerful progestin being ingested quarterly in women, and when Defendants could have warned and recommended usage of Depo-SubQ Provera 104 instead.

197. In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's Prescribing and Administering Health Care Providers were induced to, and did use Depo-Provera, thereby causing Plaintiff to endure severe and permanent injuries.

198. In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's Prescribing and Administering Health Care Providers were unable to associate the injuries sustained by Plaintiff with her Depo-Provera use, and therefore unable to provide adequate treatment. Defendants knew or should have known that the Plaintiff, Plaintiff's Prescribing and Administering Health Care Providers, and the general medical community did not have the ability to determine the true facts which were intentionally and/or negligently concealed and misrepresented by the Defendants.

199. Plaintiff and her Prescribing and Administering Health Care Providers would not have used or prescribed Depo-Provera had the true facts not been concealed by the Defendants.

200. Defendants had sole access to many of the material facts concerning the defective nature of Depo-Provera and its propensity to cause serious and dangerous side effects.

201. At the time Plaintiff was prescribed and administered Depo-Provera, Plaintiff and her Prescribing and Administering Health Care Providers were unaware of Defendants' negligent misrepresentations and omissions.

202. The Defendants failed to exercise ordinary care in making representations concerning Depo-Provera while they were involved in their manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in interstate commerce, because the Defendants negligently misrepresented Depo-Provera's significant risk of unreasonable and dangerous adverse side effects.

203. Plaintiff and Plaintiff's Prescribing and Administering Health Care Providers reasonably relied upon the misrepresentations and omissions made by the Defendants, where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of Depo-Provera.

204. Plaintiff and Plaintiff's Prescribing and Administering Health Care Providers' reliance on the foregoing misrepresentations and omissions was the direct and proximate cause of Plaintiff's injuries.

205. As a direct and proximate result of reliance upon Defendants' negligent misrepresentations, Plaintiff suffered bodily injuries and resulting pain and suffering, disability,

mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

## COUNT IX

## FRAUDULENT MISREPRESENTATION

## (Wis. Stat. § 100.18) (Against all Defendants)

206. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

207. The Defendants have represented and continue to represent to the medical and healthcare community, Plaintiff and her Prescribing and Administering Health Care Providers, and the public in general that Depo-Provera has been appropriately tested and was found to be safe and effective.

208. At all times material herein, Defendants misrepresented to consumers and physicians, including Plaintiff and Plaintiff's physicians and the public in general, that Depo-Provera is safe for use as a contraceptive and for other indications.

209. Defendants knew or should have known of the falsity of such a representation to consumers, physicians, and the public in general since Depo-Provera is far from the only contraceptive approved by the FDA, and it is not the only contraception option. Nevertheless, Defendants' marketing of Depo-Provera falsely represented Depo-Provera to be a safe and effective contraceptive option with no increased risk of intracranial meningioma and sequelae related thereto.

210. The representations were, in fact, false. When the Defendants made these representations, they knew and/or had reason to know that those representations were false, and Defendants willfully, wantonly, and recklessly disregarded the inaccuracies in their representations and the dangers and health risks to users of Depo-Provera.

211. Prior to Plaintiff's use of Depo-Provera, Defendants knew or should have known of adverse event reports indicating the development of intracranial meningioma in individuals who had taken Depo-Provera.

212. These representations were made by the Defendants with the intent of defrauding and deceiving the medical community, Plaintiff, and the public, and also inducing the medical community, Plaintiff, Plaintiff's Prescribing and Administering Health Care Providers, and/or the public, to recommend, prescribe, dispense, and purchase Depo-Provera for use as a contraceptive and other treatment indications while concealing the drug's known propensity to cause serious and debilitating intracranial meningioma and sequelae related thereto.

213. Despite the fact that the Defendants knew or should have known of Depo-Provera's propensity to cause serious and potentially debilitating injuries due to the development of intracranial meningioma and sequelae related thereto, the label did not contain any of this information in the "Warnings" section. In fact, the label for Depo-Provera has been updated at least a dozen times over the past 20 years, yet at no point did Defendants provide any of the foregoing information in the "Warnings" section. To date, the Depo-Provera label still does not include any warnings whatsoever that indicate the dangers of intracranial meningioma and sequela related thereto after using Depo-Provera.

214. In representations to Plaintiff and/or to her healthcare providers, including Plaintiff's prescribing physician, the Defendants fraudulently stated that Depo-Provera was safe and omitted warnings related to intracranial meningioma.

215. In representations to Plaintiff and/or to her Prescribing and Administering Health Care Providers, Defendants fraudulently stated that Depo-Provera was safe and concealed and intentionally omitted material information from the Depo-Provera product labeling in existence at the time Plaintiff was prescribed Depo-Provera in 2005.

216. Defendants were under a duty to disclose to Plaintiff and her physicians the defective nature of Depo-Provera, including but not limited to, the propensity to cause the development of intracranial meningioma, and consequently, its ability to cause debilitating and permanent injuries.

217. The Defendants had a duty when disseminating information to the public to disseminate truthful information; and a parallel duty not to deceive the public, Plaintiff, and/or her physicians.

218. The Defendants knew or had reason to know of the dangerous side effects of Depo-Provera as a result of information from case studies, clinical trials, literature, and adverse event reports

available to the Defendants at the time of the development and sale of Depo-Provera, as well as at the time of Plaintiff 's prescription.

219. Defendants' concealment and omissions of material facts concerning the safety of the Depo-Provera were made purposefully, willfully, wantonly, and/or recklessly to mislead Plaintiff , Plaintiff's physicians, surgeons and healthcare providers and to induce them to purchase, prescribe, and/or use the drug.

220. At the time these representations were made by Defendants, and at the time Plaintiff and/or her Prescribing and Administering Health Care Providers used Depo-Provera, Plaintiff and/or her Prescribing and Administering Health Care Providers were unaware of the falsehood of these representations.

221. In reliance upon these false representations, Plaintiff was induced to, and did use Depo-Provera, thereby causing severe, debilitating, and potentially permanent personal injuries and damages to Plaintiff. The Defendants knew or had reason to know that the Plaintiff had no way to determine the truth behind the Defendants' concealment and omissions, and that these included material omissions of facts surrounding the use of Depo-Provera as described in detail herein.

222. In comporting with the standard of care for prescribing physicians, Plaintiff's prescribing physicians relied on the labeling for Depo-Provera in existence at the date of prescription that included the aforementioned fraudulent statements and omissions.

223. These representations made by Defendants were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

224. Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiff discover the false representations and omissions of the Defendants, nor could Plaintiff with reasonable diligence have discovered the true facts about the Defendants' misrepresentations at the time when Depo-Provera was prescribed to her.

225. As a direct and proximate result of reliance upon Defendants' fraudulent misrepresentations, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and

treatment, loss of earnings, loss of ability to earn money and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

226. Defendants have engaged in willful, malicious conduct and/or conduct so careless that it demonstrates a wanton disregard for the safety of others, including Plaintiff, such that the imposition of punitive damages is warranted here.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Award Plaintiff compensatory and punitive exemplary damages in an amount to be determined at trial, and also including, but not limited to:

   a. General Damages for severe physical pain, mental suffering, inconvenience, and loss of the enjoyment of life;

   b. Special Damages, including all expenses, incidental past and future expenses, medical expenses, and loss of earnings and earning capacity;

2. Award interest as permitted by law;

3. Award reasonable attorneys' fees and costs, as provided for by law; and

4. Grant such other and further relief as the Court deems just and proper.

Dated: March 26, 2025

**KABATECK LLP**

By: ______________________________

Anastasia K. Mazzella
Matt Sahak
Attorneys for Plaintiff Mary Davies

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of the claims by jury to the extent authorized by law.

Dated: March 26, 2025

**KABATECK LLP**

By: /s/ M Sahak

Anastasia K. Mazzella
Matt Sahak
Attorneys for Plaintiff Mary Davies